# UNITED STATES DISTRICT COURT

for the
Eastern District of Wisconsin

In the Matter of the Search of: )
)
Facebook Username: Tywaun Knockavitch, Facebook User )  Case No. _17-M-1342_
ID: 100011308302732. )
)
)
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A.

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment B.

The basis for the search under Fed. R. Crim P. 41(c) is:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of:  Title 18, United States Code, Section 922(g)(3), Title 18, United States Code, Section 922(d)(1); and (3), Title 18 United States Code, Section 922(a)(1).

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Richard Connors, ATF
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: **8/25/17**
_____

_____
*Judge's signature*

City and State: Milwaukee, Wisconsin          Honorable William E. Duffin          , U.S. Magistrate Judge
*Printed Name and Title*

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, **Richard Connors**, being first duly sworn, hereby depose and state as follows:

## AGENT BACKGROUND AND INFORMATION

1. I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID as described in Attachment A.

2. I am employed as a Special Agent with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) assigned to the Milwaukee Field Office since October of 2015. I have been employed as a full time law enforcement officer for over 2 years. I have received training at the Federal Law Enforcement Training Center in Glynco, GA. I attended the Criminal Investigator Training Program, as well as ATF's Special Agent Training Program. I have received training in the investigation of unlawful possession of firearms, the unlawful transfer of firearms, and the unlawful dealing in firearms without a dealers' license. Prior to becoming a Special Agent with the ATF, I received two (2) bachelor's degrees from Northern Illinois University in the fields of Sociology and International Relations. I

1

have received a Master's degree from Northern Illinois University in the field of American

Government.

3.      I have received training in the investigation of firearms trafficking, and I work

alongside several senior ATF agents who have worked extensive firearms trafficking investigations

in the past.  Based on my training, experience, and participation in firearms trafficking investigations,

I know and/or have observed the following:

a.  I have utilized informants to investigate firearms trafficking.  Through informant interviews and debriefings of individuals involved in firearms trafficking, I have learned about the manner in which individuals and organizations distribute firearms in Wisconsin;

b.  I have also relied on informants to obtain firearms from individuals on the streets (as opposed to licensed gun dealers), known as a controlled purchase;

c.  I have experience conducting street surveillance of individuals engaged in firearms trafficking.  I have participated in the execution of numerous search warrants where firearms, ammunition, magazines, and firearms cases have been seized;

d.  I am familiar with the language utilized over the telephone to discuss firearms trafficking, and know that the language is often limited, guarded, and coded;

e.  I know that firearms traffickers often use electronic equipment, wireless and land-line telephones, and pagers to conduct firearms trafficking operations;

f.   I know that drug traffickers commonly have in their possession, and at their residences and other locations where they exercise dominion and control, firearms, ammunition, and records or receipts pertaining to such;

g.  I know that firearms traffickers often put their telephones in nominee names to distance themselves from telephones that are utilized to facilitate firearms trafficking;

h.  I know that firearms traffickers often use proceeds to purchase assets such as vehicles, property, jewelry, and narcotics.  I also know that firearms traffickers often use nominees to purchase and/or title these assets to avoid scrutiny from law enforcement officials; and

2

i. I know that firearms traffickers often use online firearms brokerage websites, such as "Armslist," to obtain firearms. I know that individuals who utilize "Armslist," will contact other users of the site regarding the sale of firearms via electronic mail (hereinafter referred to as EMAIL) and exchange phone numbers. Individuals then discuss price and meet up locations to exchange money for the firearms by phone. Individuals are not required to complete background checks through "Armslist," and individuals often do not check to see if the person to whom they are transferring the firearm is a convicted felon.

4. I have participated in several firearms trafficking investigations that involved the seizure of computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these computers, cellular phones, cameras, and other digital storage devices. On many occasions, this electronic data has provided evidence of the crimes being investigated and corroborated information already known or suspected by law enforcement.

5. The facts in this affidavit come from my personal observations, my training and experience, information obtained from witnesses, and information obtained from other agents during the course of their official duties, all of whom I believe to be truthful and reliable. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Section 922(g)(3) (possessing firearms or ammunition as an unlawful user of or as an addict to any controlled substance), Title 18, United States Code, Section 922(d)(1) (selling or disposing of any firearm or ammunition to a known felon), and Title 18 United States Code, Section 922(a)(1) (dealing firearms without a license) have been committed by Antwuan D. Pugh and his brother

3

Kenyon Q. Pugh. There is also probable cause to search the information described in

Attachment A for evidence of these as described in Attachment B.

## PROBABLE CAUSE

### A. Vehicle Stop of Antwuan PUGH and Search Warrant at the PUGH Residence

7.     On December 1, 2015, City of Miwaukee Police Department officers (MPD)

conducted a traffic stop of a 2000 black Lincoln town car, bearing state of Wisconsin license

plate 922-XXN. Antwuan PUGH (DOB XX/XX/1993) was driving the aforementioned vehicle,

which was registered to his mother, Regina Pugh. During a search of the vehicle, MPD recovered

0.7 grams of green leafy substance that field tested positive for THC, the active ingredient in

marijuana. Also recovered from Antwuan PUGH's person was a White Samsung touchscreen

cell phone, model number SM-G360T1. Shortly after the traffic stop, MPD executed a search

warrant at 8142 N. Granville Road, Milwaukee, WI, 53224.

8.     On December 1, 2015, after his arrest, Antwuan PUGH gave a recorded statement

after being advised of his *Miranda* rights which PUGH stated he understood and agreed to

waive. Antwaun PUGH stated he always smokes marijuana when he feels in a "chill" mood.

Antwuan PUGH stated he was arrested after officers located a bag of marijuana in his vehicle.

Antwuan PUGH further stated that his brother, Kenyon PUGH, has access to his bedroom at the

residence on N. Granville Road and would use it to change clothing and he occasionally left

personal items.

9.     Law enforcement officers believed Antwuan PUGH and his older brother,

Kenyon PUGH (DOB XX/XX/1986) resided at 8142 N. Granville Road, Milwaukee, WI on

December 1, 2015. Agents had conducted surveillance at the residence, and observed Antwuan

4

PUGH entering and exiting the residence on several occasions, and then entering and exiting a 2000 black Lincoln town car, bearing state of Wisconsin license plate 922-XXN.

10.     Officers searched the bedroom believed to be shared by Antwuan and Kenyon PUGH, and recovered the following: (1) paper identifiers for Kenyon PUGH, along with an envelope marked "Tweezy," a known nickname for Antwuan PUGH; (2) 1.9 grams of green leafy plant like substance which field tested positive for the presence of THC; (3) two firearms described as an Armscor of the Philippines handgun, model M1911-A1-FS, .45 caliber, bearing serial number RIA1686424; and, a Glock handgun, model 21, .45 caliber, bearing serial number TNY752. Law enforcement officers located several assorted brands and calibers of ammunition and several different magazines for firearms throughout the house. Additionally, law enforcement located the following empty gun boxes in the residence: Glock hangun boxes, model 23, .40 caliber, bearing serial numbers MHZ778, MHT876, PVL502; Glock handgun box, model 21, .45 caliber, bearing serial number TNY752; Glock handgun box, model 22c, .40 caliber, bearing serial number GHU315; one black plastic Intratec, 9mm, firearms case; one black plastic firearms case for a Armscor of the Philippines handgun, model M1911-A1-FS, .45 caliber, bearing serial number RIA1686424; one plastic black Plano firearms case; andone black cardboard Bersa handgun box for a model Thunder 45, .45 caliber, bearing serial number SG2977.

11.     Antwuan PUGH has never been convicted of a felony offense.

## B. The Pugh Brothers' Involvement with Firearms

12.     On December 6, 2014, Christopher Agena sold a Glock handgun, model 33, .45 caliber, bearing serial number XEH452, to Antwuan PUGH for $500. Mr. Agena located the

5

firearm bill of sale and provided a copy to your Affiant. On the bill of sale form underneath the "buyer" section, Antwuan PUGH filled in his contact information with an address of 8142 N. Granville Road. Mr. Agena indicated that he was contacted via "Armslist" for the purchase of the firearm. Mr. Agena stated that after contacting the individual via "Armslist," he exchanged phone numbers with the potential buyer, and the two then began exchanging phone calls and text messages. The number that Mr. Agena utilized was 414-216-7475. Mr. Agena stated that Antwuan PUGH utilized the telephone number 414-233-9677 for the aforementuioned firearm transaction.

13.    Your Affiant performed a law enforcement query of the telephone number 414-233-9677. This query revealed that the number came back as an active number for Kenyon PUGH. Kenyon PUGH provided that particular number to law enforcement as his contact number when he was cited for excessive noise under Milwaukee County Municipal citation number 48923711239. Additionally, Kenyon PUGH provided the contact number of 414-233-9677 to the Wisconsin Department of Corrections (DOC) on two separate occasions in 2015 as his personal contact number. Kenyon PUGH is prohibited from possessing firearms because he is a convicted felon under Wisconsin Court Case 2011CF002789 for aggravated battery with intent to cause bodily harm, a Class H felony, Wisconsin Court Case 2008CF000265 for receiving stolen property greater than $10,000, a Class G felony, and Wisconsin Court Case 2005CF006515 for disorderly conduct while armed, a Class B misdemeanor in Wisconsin.

14.    Your Affiant was able to obtain cell phone toll records for the telephone number 414-233-9677 during the time of the aforementioned firearm transaction. Based upon a review of the cell phone toll records obtained by your Affiant for the number 414-233-9677, your Affiant

6

was able to see that several calls and texts that were made between 414-233-9677 (believed to be Kenyon PUGH) and 414-216-7475 (Christopher Agena) on December 6, 2014. Shortly after 414-233-9677 (Kenyon PUGH) contacted 414-216-7475 (Christopher Agena), 414-233-9677 then contacted the telephone number 414-595-5206. You Affiant performed a law enforcement query for the telephone number 414-595-5206 which revealed the number belonged to Antwaun PUGH. Antwuan PUGH provided the number of 414-595-5206 to the Milwaukee County Sheriff's Office on December 8, 2014, as his personal contact number. Toll records revealed that the number listed for Christopher Agena, was contacted by the number listed for Kenyon PUGH. The number for Kenyon PUGH then contacted the number for Antwuan PUGH several times before Antwuan PUGH met with Christopher Agenta to conduct the firearm transaction.

15.    You Affiant is aware that law enforcement recovered the .45 caliber Glock handgun, bearing serial number XEH452, previously mentioned from J.R. on September 16, 2015. J.R. was a convicted felon prior to this event, and pled guilty to being a Felon in Possession of a Firearm in the Eastern District of Wisconsin.

16.    On April 18, 2016, your Affiant interviewed Robert Warren regarding a Glock handgun, model 21, .45 caliber, bearing serial number TNY752. Mr. Warren indicated that he sold the firearm on "Armslist" on November 9, 2015. Mr. Warren produced a cell phone bill for his telelphone number 301-659-4212. Mr. Warren was able to show that the number with which he negotiated the firearm deal was 414-233-9677 (Kenyon PUGH). Mr. Warren stated he met the individual at the Park and Ride in Johnsons Creek, WI. Mr. Warren stated the purchaser of the firearm was the passenger of a Yellow Monte Carlo, a black male, roughly 260-270 pounds with "shaggy" hair. Mr. Warren observed several photos and identified a MPD booking photo of

7

Antwuan PUGH as the individual who possibly purchased the firearm. Mr. Warren was not certain due to differing skin tones, but could recall the letter "D" as the middle intitial of the person who bought the firearm identification card. Mr. Warren stated he received around $400 to $450 dollars for the firearm. Mr. Warren stated he believed the vehicle to be an older model Chevrolet Monte Carlo.

17.     On December 1, 2015, law enforcement recovered the Glock handgun, model 21, .45 caliber, bearing serial number TNY752, from Antwuan PUGH's residence located at 8142 N. Granville Road, Milwaukee, WI, 53224, as detailed in Paragraph 11 of this affidavit.

18.  ·   Affiant interviewed Derek Harmsen in regard to three (3) Glock handguns, model 23, .40 caliber, bearing serial numbers MHT876, PVL502, MHZ778, respectively. Mr. Harmsen indicated he sold the firearms on "Armslist," on November 15, 2015 to Antwuan PUGH. Mr. Harmsen stated that before he sold the firearms to Antwuan PUGH, he observed Antwuan PUGH'S driver's license, and the photograph on the license matched the individual identifying himself as Antwuan PUGH. Mr. Harmsen indicated that he queried Antwuan PUGH in the Wisconsin Circuit Court Access Program (CCAP), and the results revealed that Antwuan PUGH was not a convicted felon in the state of Wisconsin. Mr. Harmsen stated that the person whom he contacted regarding the firearms transaction utilized the number 414-233-9677 (Kenyon PUGH). Mr. Harmsen required that Antwuan PUGH fill out three (3) bills of sale for the firearms. Antwuan PUGH wrote the telephone number 414-233-9677 on each bill of sale. Mr. Harmsen received $1,250.00 for the three (3) firearms.

19.     Your Affiant was able to obtain telephone toll records for the firearms transaction between Derek Harmsen and Antwuan PUGH. Mr. Harmsen utilized the telephone number 262-

8

853-8025. Records reflect that the telephone number 414-233-9677 (Kenyon PUGH) sent and exchanged text messages with Mr. Harmsen on November 13, 2015. The next day, November 14, 2015, telephone number 414-233-9677 (Kenyon PUGH) called the number 414-793-2282 several times, and each call appears to have been answered based upon the length of the contact. Telephone number 414-793-2282 was provided by Antwuan PUGH to MPD on December 1, 2015, as his personal contact number when he was stopped and arrested that same day.

20.    The Glock handgun, model 23, .40 caliber, bearing serial number MHT876, was recovered during a traffic stop by MPD on March 1, 2016. Located inside the vehicle officers found a convicted felon and three other individuals, all of whom have suspected ties to narcotics trafficking in the Milwaukee County area. The other two Glock handguns purchased by Antwuan PUGH on November 15, 2015 from Mr. Harmsen, have yet to be recovered by law enforcement.

21.    On August 12, 2016, your Affiant telephonically interviewed John Vetta regarding a SCCY Industries LLC handgun, model CPX-2, 9mm, bearing serial number 105111. Mr. Vetta stated he sold the firearm on "Armslist" to a person with the email address address of KeonP86@Yahoo.com (it should be noted Kenyon Pugh was born in 1986). Mr. Vetta stated the two moved to telephone communication from the number 414-233-9677 (Kenyon PUGH). Mr. Vetta stated he sold the firearm on November 22, 2015. Mr. Vetta could not recall who bought the firearm; however, he did remember the license plate. Mr. Vetta explained the person arrived at the Cabellas in Richfield, WI, in a Yellow Chevrolet Monte Carlo bearing Wisconsin license plate 274-XET. This vehicle is registered to Chaniqua L. BELL. Your Affiant believes that BELL is a longtime girlfriend of Kenyon PUGH, and Affiant has observed during surveillance her yellow Chevrolet Monte Carlo at the PUGH's residence on Granville Road several times.

9

Mr. Vetta stated he negotiated the transaction from a person he believed was a male, and a black male and female arrived to conduct the transaction. Mr. Vetta stated the female handled the paperwork and the firearm, and the black male made some sort of comment that "He was a Glock guy."

22. Mr. Vetta eventually located a bill of sale for the firearm and provided it to your Affiant. The purchaser of the firearm was identified as Chaniqua L. BELL.

23. The firearm sold from Mr. Vetta to BELL was recovered on April 28, 2016, by MPD. The firearm was recovered during the commission of an armed robbery commited by D.D. D.D. subsequently pled guilty to a Hobbs Act robbery, use of a firearm during and in relation to the robbery, and an attempted Hobbs Act robbery in August 2016 in the Eastern District of Wisconsin.

24. On March 22, 2016, your Affiant interviewed Michael Doe regarding a Kahr Arms handgun, model CW-45, bearing serial number SG2977. Mr. Doe indicated he sold the firearm on "Armslist," an online firearms brokerage website, in September of 2014.

25. On December 1, 2015, law enforcement recovered the aforementioned firearm box (box only) from Antwuan PUGH's residence located at 8142 N. Granville Road, Milwaukee, WI, 53224, as detailed in Paragraph 11 of this affidavit.

26. Utilizing the National Integrated Ballistic Information Network (hereinafter refered to as NIBIN), a software used to match shell casings from a crime scene to a particular firearm, MPD was able to match two separate crime scenes to the Kahr Arms handgun. The first incident occurred on February 11, 2015. In this incident, the victim was shot in the neck by the aforementioned firearm and later died from this injury. The second incident occurred on

10

February 15, 2015. In this incident, an unknown actor discharged the aforementioned firearm within one hundred (100) yards of an occupied dwelling within the City of Milwaukee.

27. MPD recovered the Kahr Arms handgun from A.K.D. on April 16, 2015, when he was arrested for carrying a concealed weapon. A.K.D. indicated he purchased the firearm from a person named "Dooky" in Milwaukee around March of 2015. At the time of the firearm's recovery A.K.D. was not a convicted felon.

28. On April 8, 2016, Affiant interviewed Jonathan B. MILLER regarding a Glock GMBH handgun, model 22C, .40 caliber, bearing serial number GHU315. MILLER indicated he purchased the firearm in November of 2014. Affiant was able to aquire ATF multiple sale form M20140277848, which revealed MILLER purchased the firearm on November 3, 2014. MILLER indicated he sold the firearm on "Armslist" to an individual he knew to be K.S. on May 7, 2015. MILLER believed Kevin Sweepee to be an Asian American male.

29. On December 1, 2015, law enforcement recovered the gun box for the Glock GMBH handgun, model 22C, .40 caliber, bearing serial number GHU315, from Antwuan PUGH's residence located at 8142 N. Granville Road, Milwaukee, WI, 53224, as detailed in Paragraph 11 of this affidavit.

30. Utilizing NIBIN, MPD was able to match the casings from the Glock GMBH handgun, model 22C, .40 caliber, bearing serial number GHU315, to a homicide that occurred in Rockford, Illinois, on December 16, 2015. The victim was a seventeen-year old male.

31. On April 9, 2016, the Glock GMBH handgun, model 22C, .40 caliber, bearing serial number GHU315, was recovered in the City of Milwaukee. Possessing the firearm was

11

D.W. D.W. is a convicted felon. As a result of D.W.'s possession of the Glock, D.W. subsequently pled guilty to being a Felon in Possession of a Firearm.

32.     On February 22, 2016, Affiant interviewed Shawn Black regarding a Armscor of the Philippines handgun, model M1911-A1, .45 caliber, bearing serial number RIA1686424. Mr. Black indicated he sold the firearm on "Armslist," sometime in September of 2015. Mr. Black stated he saw the exact firearm for sale back on "Armslist" for a higher listed price in October of 2015. Mr. Black stated he believed it was the same firearm due to the unique white grips affixed to the firearm. Mr. Black could not provide a name for the person to whom he sold the firearm.

33.     On November 22, 2015, the aforementioned firearm was believed to be utilized in a shooting that occurred into a house located at 86XX N. 106th St., Milwaukee, WI. At the time of the shooting, witnesses observed a black Lincoln town car speed away from the scene of the shooting. Law enforcement officers know that Antwuan PUGH operates a black Lincoln town car bearing state of Wisconsin license plate 922-XXN, as evidenced by the vehicle stop on December 1, 2015, and as detailed in Paragraph 9 of this Affidavit.

34.     On December 1, 2015, law enforcement recovered the Armscor of the Philippines handgun, model M1911-A5, .45 caliber, bearing serial number RIA1686424, in Antwuan PUGH's bedroom, as detailed in pagagraph 11 of this affidavit. This firearm NIBIN tested positive to the shell casings recovered from the scene of the shooting that occurred on November 22, 2015 on 106th Street.

### C. Antwuan PUGH's Post-Arrest Statement and Other Records

35.     On December 1, 2015, during Antwuan PUGH's recorded *Mirandized* statement, Antwuan PUGH stated that the firearms located in the house were in his bedroom and that both

12

firearms in his bedroom were purchased by a girlfriend. Antwuan PUGH stated he bought three (3) or four (4) guns that year and had already sold them. Antwuan PUGH stated he sold a Glock firearm on the "street" and he did not know the person's name, Email, or phone number. Antwuan PUGH further stated that he had the two Glock firearms from the cases in his bedroom, but he sold those as well. Antwuan PUGH stated he has never bought a firearm at a gun store and only from "Armslist" because it is cheaper.

36.     On April 21, 2016, your Affiant received copies of reported wages from the Wisconsin Department of Workforce Development (hereinafter refered to as DWD) for Antwuan and Kenyon PUGH. The DWD report outlines a person's reported earnings for any given particular year. In 2015, the PUGH brothers reported earning a combined $243.86. In November of 2015 alone, Antwuan PUGH spent a combined $1,700 on four (4) Glock handguns from two different individuals. From December 2014 through Novemebr 2015, the PUGHs are suspected of purchasing eleven (11) firearms from "Armslist," many of which have been recovered during the commission of crimes throughout the city of Milwaukee.

### D. Antwuan and Kenyon PUGH's Post Search Warrant Activity

37.     On March 11, 2016, Kenyon PUGH was a victim of a non-fatal shooting where he was struck in the left calf. The incident occurred at 6448 N. 106th St., Milwaukee, WI. Located at the scene was a white Lexus RX300 bearing state of Wisconsin License plate number 274-XET. A check of the registration revealed that it listed to to Regina Pugh (Kenyon and Antwuan PUGH's mother). Located in the center console of the vehicle was one (1) black 9mm M&P magazine containing four (4) unfired 9mm Aguila cartridges. Recovered from the scene were four (4) spent 9mm Aguila shell casings. Witnesses observed an individual running from the scene

13

where the shooting occurred. This individual jumped into a Yellow, Chevrolet Monte Carlo. Law enforcement's review of footage from the hospital where Kenyon PUGH was taken after the shooting revealed Kenyon PUGH being dropped off in a Yellow, Chevrolet Monte Carlo.

38.     Kenyon PUGH was interviewed at the hospital regarding this incident. Initially, Kenyon PUGH stated his name was Antwuan PUGH. Kenyon PUGH also stated the shooting occurred at a different address. Recovered inside of Kenyon PUGH's pocket was a key to the Lexus, which was revocered from the scene of the shooting. When investigators confronted Kenyon PUGH with the inconsistencies in his statement, he continued to deny any involvement with the white Lexus, and the shooting on 106th Street.

39.     Kenyon PUGH was subsequently arrested for a violation of parole order following the shooting. Kenyon PUGH was incarcerated within the Wiscosnin Department of Corrections until he was released on February 21, 2017.

40.     On July 17, 2016, MPD exeucuted a search warrant at 36XX N. Palmer Street in Milwaukee. MPD recovered several firearms during the course of the search warrant, along with several calibers of ammunition, various gun cases, and holsters. MPD sent the property to their forensic examantion division. Item number 9, under MPD inventory number 1602526, is a black and blue FNH gun case with a plastic ziplock bag recovered from inside the case. MPD identified Antwuan PUGH's fingerprints from the plastic bag recovered from inside the gun case.

### E.  Search Warrant of Antwuan PUGH's Cell Phone by ATF

41.     On June 29, 2017, your Affiant obtained a federal search warrant signed by the Honorable Magistrate Judge David Jones for one (1) white Samsung touchscreen cell phone

14

bearing serial number 354335/07/551193/3 (hereinafter referred to as Device A). MPD recovered the phone from Antwaun PUGH on December 1, 2015.

42. On July 10, 2017, your Affiant examined the contents of the cell phone. The first section examined was entitled "Facebook Chat." Your Affiant is aware that individuals are able to utilize "Facebook Messenger" to communicate with other persons who have Facebook accounts. Individuals are able to use "Facebook Messenger" without a wireless connection to their mobile devices. Facebook Members can utilize any wi-fi network to access "Facebook Messenger." Your Affiant recognized the Facebook profile "Twez Knockavitch" as a previous Facebook profile for Antwuan PUGH. Affiant viewed pictures for this Facebook profile, and these pictures match an MPD booking photo of Antwuan PUGH.

43. On several posts made by this profile, the user states his telephone number is 793-2282, which is the number that Antwuan PUGH provided to MPD on December 1, 2015, as referenced in Paragraph 19 of this affidavit.

44. Throughout the Facebook chat, the user "Twez Knoackavitch" makes several posts regarding firearms and narcotics. The profile "Twez Knockavitch" made several references to possessing "heats," which I know is a common street term for a firearm.

45. On November 23, 2015, the profile "Twez Knockavitch" posted the following comment in a group chat setting: "I shot they ass up the nigga momma don't want me to hurt him she gave me 375 cause the pulled off wit my pills." Further in the conversation, this user posts "I gave dude the pills he got in the truck like he was gonna count them instead he pulled off I shot 12 times fuck they van up I turn around they seen me shot once I roll my window down shot my last 3 pulled off made sure I want followed duck my car at Jessie crib call my nigga and he

15

called his mom she paid me." Your Affiant believes Antwuan Pugh referred to the shooting that occurred on November 22, 2015, as described in Paragraphs 33 and 34 of this affidavit.

46. Your Affiant examined the text message portion of the cell phone. Your Affiant observed several messages between Antwuan and Kenyon PUGH, dated November 30, 2015, regarding the sale and trade of firearms, types of firearms, and prices of firearms. Antwuan PUGH sent photos of firearms to Kenyon PUGH as well. Also in November 2015, Antwuan PUGH exchanged several text messages with other individuals who were inquiring about firearms that PUGH had for sale. The subject of these messages often included the prices of firearms.

47. Your Affiant examined the photo portion of the cell phone. Your Affiant was able to view several pictures of handguns that Antwuan PUGH sent to various individuals. On November 24, 2015, Antwuan PUGH created a photo of what appears to be him holding a model 1911, .45 caliber handgun, the same caliber handgun used in the shooting on November 22, 2015. Your Affiant was also able to view several different types of firearms displayed within the contents of Antwuan PUGH's cell phone.

## F. The PUGHS' Facebook Accounts

48. In February of 2017, your Affiant located two new Facebook profiles for Antwuan PUGH. The first profile is entitled "Tywaun Knockavitch." Your Affiant believes that this is the same profile as "Twez Knockavitch," but that Antwuan PUGH switched the first names of the profile. Your Affiant is aware that users are able to switch their names by simply clicking into Facebook's settings and selecting "edit name." Your Affiant has reviewed several pictures for the profile "Tywaun Knockavitch," and has positively identified Antwuan PUGH as

16

the individual in the photographs. The first post witnessed from the publicly viewable portion of profile page "Tywaun Knockavitch" is dated February 13, 2016. Your Affiant is aware that Antwuan PUGH's nickname is "Twez," "Tweeezy," or "Tywaun," based upon a review of cell phone records and communications.

49.     In February of 2017, your Affiant observed a photograph of Antwuan PUGH on the publicly viewable portion of the Facebook profile "Tywaun Knockavitch," which was posted to the page on November 8, 2016. The photo depicts Antwuan PUGH holding what appears to be a loaded Taurus handgun. A metallic gold object suspected of being a flat nose full metal jacket live cartridge within the suspected handgun was visible. On May 8, 2017, your Affiant contacted ATF's Firearms Ammunition and Technology Division (FATD). FATD provided your Affiant with a side by side photograph of the suspected firearm depicted in the Facebook photo and a photograph of a Taurus handgun, model PT 24/7 G2, .40 caliber. In the photographs, both pictures have similar characteristics on the slide of the firearm, the rail, and the thickness of the trigger guard. Based upon this review, your Affiant believes the firearm Antwuan PUGH held in the photograph is a real firearm.

50.     The second Facebook profile located for Antwuan PUGH is listed under the profile name "Cart'ier Pugh." Your Affiant observed the photographs of the individual depicted on the profile page and positively identified Antwuan PUGH. The first post that can be viewed publicly from this page and occurs on October 16, 2016. The Facebook user for "Cart'ier Pugh" posted last in July 2017.

17

## SUMMARY

51.     Affiant reasonably believes, based on the forensic data uncovered from the cell phone of Antwuan PUGH, that Antwuan utilized other modes of electronic communication (i.e. Facebook) to conduct firearms transactions and other nefarious activities. Affiant believes, based upon such records and information, as detailed herein, that Kenyon PUGH, a previously convicted felon, was organizing several firearms transactions via "Armslist" and then having his brother, Antwuan PUGH, a non prohibited person, conduct the transaction with the seller of the firearm. Affiant believes that Antwuan PUGH was actively engaged in the distribution of firearms along with his brother Kenyon PUGH. Your Affiant bases this belief from texts messages, Facebook chats, and photographs uncovered from Antwuan PUGH's cell phone. Affiant is aware that "Facebook Messenger" is a commonly used method of communication for people who lack sufficient resources for a cellular plan. "Facebook Messenger" is a free application that can be used by anybody that has any type of wi-fi enabled device. Your Affiant is aware that Facebook keeps and maintains these conversations.

52.     Affiant is aware that someone who purchases firearms on behalf of a prohibited person is called a "straw purchaser." The straw purchaser conducts the transaction so as to not be detected by law enforcement. The straw purchaser then distributes the firearm or firearms accordingly to other individuals who are often prohibited from lawfully possessing firearms. Affiant reasonably believes that Antwuan PUGH was acting as a straw purchaser for his brother Kenyon PUGH. Affiant believes that the brothers utilized their cell phones and Facebook messenger to facilitate firearms transactions amongst themselves, and evidence of firearms

18

trafficking may likely be stored and recorded on Antwuan PUGH's Facebook account as described in Attachment A.

53.     Affiant is aware that firearms traffickers frequently possess cellular telephones. For example, a firearms trafficker may use one cellular phone to communitcate with potential sellers of firearms and indivduals wishing to purchase the firearms from the trafficker. Affiant is aware the cellular telephone possess the capability to log into and operate Facebook and "Facebook Messenger." Affiant therefore believes that information contained within the Facebook profile listed in Attachment A, and on the face of this search warrant, contains evidence of firearms trafficking. The main function of Facebook in this instance was the utilization of its messenger application.

54.     Affiant is aware that persons who traffic in firearms frequently record images, both still and moving, of themselves in possession of firearms. Based on my training and experience I know that, although counter intuitive, persons who are prohibited from possessing firearms inexplicably take or keep pictures of firearms they have in their possession, as well as photographs of themselves holding or displaying the firearms in their possession. Affiant is aware that Facebook can store, and maintain photos sent to and from each user; these photos can often depict firearms as outlined above where Antwuan PUGH posted a photograph of what appears to be a firearm to the publicly viewable portion of the Facebook page, "Tywaun Knockavitch."

55.     Affiant is aware that individuals who possess and use drugs such as marjijuana will often arrange these transactions via their cell phones and other messeging applications such as Facebook Messenger. Given that Antwuan PUGH was arrested with marijuana in the vehicle,

19

and that marijuana was recovered in his bedroom, it reasonable that there could be messages, voice calls, and photographs of marijuana located within the Facebook content of Antwuan PUGH's Facebook profle page.

56.    Affiant is aware that Antwuan and Kenyon PUGH exchanged photographs via text message from their cell phones. Affiant also believes the two also communicated regarding the sale and purchase of firearms, along with photographs of firearms the two were looking to purchase within their Facebook accounts. Affiant is aware the cell phone forensic data was uncovered during late 2015. Affiant believes that, based on the PUGHs' activities after the execution of the warrant of their residence at 8142 N. Granville, Road, Milwaukee, WI, and after Antwuan PUGH's subsequent arrest, the two have not stopped acquiring and distributing firearms.

57.    The above examples of conversations, reports, and cell phone forensic examination have led your Affiant to believe that Antwuan and Kenyon PUGH are involved in the illegal purchase and distribution of firearms. I respectfully request that the aforementioned Facebook pages be searched to investigate Antwuan PUGH  for the following crimes; (1) possession of a firearm by a prohibited person in violation of Title 18, United States Code, Sections 922(g) (1) (3); (2) and selling or disposing of any firearm or ammunition to a known felon, in violation of Title 18, United States Code, Section 922(d)(1); and, (3) dealing firearms without a license, in violation of Title 18 United States Code, Section 922(a)(1).

## **TECHNICAL BACKGROUND**

58.    Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish

20

accounts with Facebook, and users can then use their accounts to share written news,
photographs, videos, and other information with other Facebook users, and sometimes with the
general public.

59.     Facebook asks users to provide basic contact and personal identifying information
to Facebook, either during the registration process or thereafter. This information may include
the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook
security questions and answers (for password retrieval), physical address (including city, state,
and zip code), telephone numbers, screen names, websites, and other personal identifiers.
Facebook also assigns a user identification number to each account.

60.     Facebook users may join one or more groups or networks to connect and interact
with other users who are members of the same group or network. Facebook assigns a group
identification number to each group. A Facebook user can also connect directly with individual
Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request"
accepts the request, then the two users will become "Friends" for purposes of Facebook and can
exchange communications or view information about each other. Each Facebook user's account
includes a list of that user's "Friends" and a "News Feed," which highlights information about
the user's "Friends," such as profile changes, upcoming events, and birthdays.

61.     Facebook users can select different levels of privacy for the communications and
information associated with their Facebook accounts. By adjusting these privacy settings, a
Facebook user can make information available only to himself or herself, to particular Facebook
users, or to anyone with access to the Internet, including people who are not Facebook users. A
Facebook user can also create "lists" of Facebook friends to facilitate the application of these

21

privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

62. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

63. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

64. Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other

22

information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

65.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

66.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

67.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

68.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

69.     Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

23

70.     The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

71.     Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

72.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

73.     Some Facebook pages are affiliated with groups of users, rather than one individual user. Membership in the group is monitored and regulated by the administrator or head of the group, who can invite new members and reject or accept requests by users to enter. Facebook can identify all users who are currently registered to a particular group and can identify the administrator and/or creator of the group. Facebook uses the term "Group Contact Info" to describe the contact information for the group's creator and/or administrator, as well as a PDF of the current status of the group profile page.

74.     Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends'

24

Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

75.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

76.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

77.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element

25

or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

26

78.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

79.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

80.     Based on the forgoing, I request that the Court issue the proposed search warrant.

81.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

82.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

27

## ATTACHMENT A

### Property to be Searched

This warrant applies to information associated with the following Facebook username and user ID, which is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California.

1.  Facebook Username: Tywaun Knockavitch, Facebook User ID: 100011308302732.

1

## ATTACHMENT A

### Property to be Searched

This warrant applies to information associated with the following Facebook username and user ID, which is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California.

1. Facebook Username: Cart'ier Pugh, Facebook User ID: 100013882987756.

## ATTACHMENT B

### Particular Things to be Seized

## I.    Information to be disclosed by Facebook

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

   a.    All contact and personal identifying information, including the full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers of Facebook Username: Tywaun Knockavitch, Facebook User ID: 100011308302732; and, Facebook Username: Cart'ier Pugh, Facebook User ID: 100013882987756.

   b.    All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

   c.    All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them;

   d.    All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which

1

the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

e. All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

f. All "check ins" and other location information;

g. All IP logs, including all records of the IP addresses that logged into the account;

h. All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked;"

i. All information about the Facebook pages that the account is or was a "fan" of;

j. All past and present lists of friends created by the account;

k. All records of Facebook searches performed by the account;

l. All information about the user's access and use of Facebook Marketplace;

m. The types of service utilized by the user;

n. The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

o. All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

2

p.     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

## II.    Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence, and instrumentalities of violations of 18 U.S.C. § 922(g)(3) (possessing firearms or ammunition as an unlawful user of a controlled substance), 18 U.S.C. § 922(d)(1) (selling or disposing of any firearm or ammunition to a known felon), and 18 U.S.C. § 922(a)(1) (dealing firearms without a license), involving Antwuan Pugh since December 1, 2014, including, for each user ID identified on Attachment A, information pertaining to the following matters:

a.  The relevant offense conduct, any preparatory steps taken in furtherance of the scheme, communications between Antwuan Pugh and others related to the relevant offense conduct of the sale of firearms and sale and use of controlled substances;

b.  Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

c.  Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

d.  The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s);

3

e. The identity of the person(s) who communicated with the user ID about matters relating to relevant offense conduct of the sale of firearms and sale and use of controlled substances, including records that help reveal their whereabouts.

4